STATE v. EDWARD THEODORE RAY

No. 741

(Filed 11 December 1968)

**1. Constitutional Law § 29;    Indictment and Warrant § 2——    necessity for valid indictment**

   A valid indictment is a condition precedent to the jurisdiction of the Superior Court to determine the guilt or innocence of the defendant, and

to give authority to the court to render a valid judgment. N. C. Constitution, Art. I, § 12.

**2. Indictment and Warrant § 2—  return by illegally constituted grand jury**

An indictment returned by a grand jury not legally constituted is not a valid indictment.

**3. Grand Jury § 3;  Constitutional Law § 29—  indictment by improperly constituted grand jury**

A conviction of a Negro cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race.

**4. Grand Jury § 3—  challenge to racial composition — burden of proof**

The burden is upon the defendant to establish the racial discrimination alleged in his motion to quash the indictment, but once a *prima facie* case is made out the burden shifts to the prosecution.

**5. Grand Jury § 3—  use of tax lists**

A jury list is not discriminatory merely because it is made from the tax list, although it is better practice to supplement such list by resorting to voter registration and other available lists.

**6. Grand Jury § 3—  sufficiency of evidence for prima facie showing of discrimination**

Defendant's evidence that the tax rolls used in compiling the jury list designated the race of each taxpayer *is held* insufficient to make a *prima facie* showing of unconstitutional discrimination against Negroes in the grand jury selection where (1) the computer firm hired to compile the jury list was instructed by the county to prepare the list without regard to race or sex and to allow no words on the list which would identify a person's race, (2) the compiled jury list contained no designations as to race, (3) no names were eliminated from the list except nonresidents and corporations, and (4) there was no evidence as to the racial composition of the county or as 'to the number of Negroes who, have served upon the grand or petit juries of the county.

**7. Grand Jury § 3—  evidence of no discrimination**

A jury list containing the names of over half of the population of the county is some evidence in itself that there was no discrimination in the preparation of the list.

**8. Criminal Law § 166—  the brief — abandonment of exception**

Where the denial of defendant's motion to quash the array of the petit jury is not brought forward in an assignment of error and discussed in the brief of defendant, an exception thereto is deemed to be abandoned. Rule of Practice in the Supreme Court No. 28.

**9. Criminal Law § 15—  change of venue — pretrial publicity**

In prosecution of a Negro defendant upon indictment charging the rape of a white woman, defendant's motion for change of venue on the ground

of widespread pretrial publicity by the news media of the county is addressed to the sound legal discretion of the trial court, whose ruling thereon will not be disturbed on appeal where (1) the trial court's interrogation of the jurors failed to show that they had formed an opinion in respect to the guilt or innocence of the defendant and (2) there is no showing that defendant had exhausted his peremptory challenges.

**10. Jury § 7— challenges**

A defendant on trial has the right to reject any juror for cause or within the limits of his peremptory challenges before the panel is completed.

**11. Searches and Seizures § 1— search without warrant — search on premises of another**

Immunity from unreasonable searches and seizures is a personal right, and one cannot object to the search of another's premises or property if the latter consents to the search, even though property is found for the possession of which defendant is subsequently prosecuted.

**12. Searches and Seizures § 1; Criminal Law § 84— seizure without warrant of defendant's clothing — reasonableness of seizure — admissibility**

In a prosecution for rape, the seizure by police officers without a warrant of defendant's bloodstained sweater allegedly worn by him at the time of the rape was not unlawful, and the sweater was properly admitted into evidence, where (1) the sweater was in a friend's home where defendant was permitted to sleep, (2) the friend's wife voluntarily gave to the officers the suitcase wherein the sweater was found, (3) the suitcase was in a room other than the one in which defendant slept, and (4) defendant paid no rent, had no key to the house, and exercised no control over the house.

**13. Rape § 4; Criminal Law § 42— competency of evidence — defendant's clothing**

In prosecution for rape, trial court properly refuses to strike evidence that F.B.I. laboratory tests showed bloodstains on defendant's sweater, since the jury could reasonably infer from the evidence that defendant wore the sweater at the time of the alleged offense and since the stains were corroborative of the State's theory of the case.

**14. Rape § 4; Criminal Law § 68— competency of evidence — hair**

In a prosecution of Negro defendant for the rape of a white woman, admission of testimony that hair possessing Negro characteristics was found in the debris of the prosecutrix' automobile where the alleged rape took place is proper.

**15. Searches and Seizures § 1— lawfulness of seizure**

Cigarettes which constituted evidence of the crime for which defendant was charged were not obtained as a result of an unlawful search and seizure where defendant's friend brought the cigarettes to the police to be given to defendant.

APPEAL by defendant from *Carr, J.,* April 1967 Session of DUR-HAM.

Criminal prosecution upon the following indictment charging the capital offense of rape:

> "The Jurors for the State, Upon Their Oath, Present, That, EDWARD THEODORE RAY, in Durham County, on or before the 7th day of December, 1966, with force and arms, at and in the County aforesaid, did, unlawfully, willfully, and feloniously ravish and carnally know Jeane Daily, a female, by force and against her will against the form of the statute in such case made and provided and against the peace and dignity of the state."

Defendant, who was represented by his court-appointed attorneys C. C. Malone, Jr., a Negro, and R. Roy Mitchell, Jr., a white person, entered a plea of not guilty. Verdict: Guilty of rape with the recommendation that punishment be imprisonment in the State's Prison for life. See G.S. 14-21. Upon the return of the verdict, defendant's counsel asked that the jury be polled. Each juror upon the poll said that he found for his verdict that the defendant was guilty of rape with the recommendation that punishment be imprisonment in the State's Prison for life, and that he still assented thereto.

From a judgment of life imprisonment, pursuant to the provisions of G.S. 14-21, defendant appealed.

*Attorney General T. W. Bruton, Deputy Attorney General James F. Bullock, and Deputy Attorney General Harry W. McGalliard for the State.*

*C. C. Malone, Jr., for defendant appellant.*

PARKER, C.J.

Defendant is an indigent. By order of the trial court, he was permitted to appeal *in forma pauperis,* and the county of Durham was ordered to furnish his counsel a transcript of the trial, and the county of Durham was ordered to pay the cost of mimeographing the appeal and the brief of his counsel. A writ of *certiorari* was allowed, upon petition of defendant's counsel, C. C. Malone, Jr., giving him additional time to prepare his case on appeal, which accounts for the delay in the hearing of the appeal. C. C. Malone, Jr., one of the trial counsel and defendant's counsel of record in this Court, filed a brief and made an oral argument here.

A brief summary of the State's evidence is as follows: Mrs. Jeane Daily, a white woman, was married to John Calvin Daily, and they had a son two years old. They lived in the city of Durham. On 7 December 1966 about 7:30 p.m., she went shopping alone and parked her 1965 Pontiac Tempest in the back parking lot next to Sears Roebuck and Company, one of two parking lots operated by Sears Roebuck and Company. Sears Roebuck and Company is on Main Street in the city of Durham. She remained in Sears Roebuck and Company's store about thirty minutes. She then returned to her automobile and got in it. Before she could close the front door on her side, she saw defendant, Edward Theodore ·Ray, standing at the open door of her automobile. He pointed a pistol at her and told her to move over. She refused. Defendant told her if she did not move over he would blow her head off. Defendant Ray got in the car, crawled over her, and while still pointing the pistol at her ordered her to drive. She did not see anyone else in the parking lot. She drove out of the closest exit, made one right turn and then another, at which time she did not know where she was. She drove for approximately ten minutes, making several right and left turns. She brought the automobile to a halt at the command of the defendant in a dark area which seemed to be under construction. Defendant told her to get into the back seat. Defendant had put the pistol in his pocket but drew it again when out of fear she began screaming. She then got into the back seat at the defendant's command, and defendant Ray got into the back seat of the automobile with her. Defendant started pulling and jerking at her raincoat and blouse in an effort to take them off. At this point defendant Ray noticed her wrist watch and said that he would take the watch and started pulling on it. Defendant was unable to unfasten the catch on the watch and told her to take it off. When she took it off, she noticed the guard chain was broken. She also noticed that defendant Ray was wearing a dark sweat shirt and dark trousers. Defendant made her remove her skirt, and he raped her. It is not necessary to repeat her words in respect to the sordid details of the rape. As she was lying in the back seat of the car she heard an automobile and said, "There is a car." Defendant Ray jumped up and she started screaming, at which time defendant Ray got out of the automobile into the street. When defendant opened the door she got out of her automobile and ran to an automobile which was passing them driving very slowly. As she was running to catch up with the automobile, she heard a gunshot behind her. When she reached the automobile which had passed at a slow rate of speed, she asked the driver to

please help her. The driver opened the door and she crawled into the back seat of the car. At that time she was completely naked.

George W. Jackson was employed as a night watchman by M. B. Kahn Construction Company, which was in the process of constructing the Fayetteville Street Housing Project in the city of Durham. As he was making his rounds as night watchman in his automobile about ten or twelve minutes after 8 p.m. on the night in question, he noticed a car standing still and heard someone screaming and hollering. When he paused to stop his automobile beside the Daily automobile, a man raised up in the back seat. The lady was still hollering. As soon as the man in the back seat raised up, he (Jackson) idled his car off very slowly. He saw a Negro man who got out of the car and ran. Mrs. Jeane Daily ran to his car, screaming and asking for help. She had no clothes on. He opened his automobile door and she climbed over into the back seat. As she was getting into his car, he heard a shot, the sound coming from behind him. By the time she was fully in his automobile, he heard another shot. He then heard someone running through the housing project stepping on loose boards that had been left there. He asked Jeane Daily what had happened. After she told him and after seeing her naked, he told her to cover herself with his overcoat which was in the back seat. She had blood on her legs. He drove to a service station and called the police and Jeane Daily's husband.

After Mrs. Daily was assaulted, W. H. Upchurch, a detective in the police department of the city of Durham, found a cigarette lighter on the floor of the back seat of her automobile. Mrs. Daily and her husband stated the lighter did not belong to them. Mary Ann Gibson, a witness for the State, testified that defendant Ray was living in the living room of her house during December 1966. She identified the cigarette lighter the police found in Mrs. Daily's automobile as a cigarette lighter belonging to defendant Ray. Defendant Ray had permitted her to use it in her house when she did not have a match. It had an unusual design-like umbrella handle. She has never seen a cigarette lighter like it before. The flap on the lighter that defendant Ray had was loose. She saw defendant put the cigarette lighter in his pocket on the night of 7 December 1966. She testified that the next day, to wit, 8 December 1966, defendant Ray asked her and her husband if they had seen a cigarette lighter anywhere around the house. She saw the lighter the last time on 7 December 1966. Defendant left her house when it was about dark on 7 December 1966 wearing a dark blue pull-over sweater and a pair of overalls, and did not return until about 9 o'clock that night. De-

fendant returned wearing the same garments; however, it appeared as though he had been running through bushes for his trousers were full of briars. She had seen defendant Ray with a pistol that looked like State's Exhibit No. 6. On 7 December 1966 she heard Ray ask her husband for some bullets and Ray fired the pistol once in her back yard.

Alden Gibson, the husband of Mary Ann Gibson, testified in brief summary: During December 1966 defendant Ray was living in his house. He was unemployed and paid no rent. During the afternoon of 7 December 1966 he and Ray drank some wine. On 7 December 1966 Ray asked him to fix a jammed gun for him. After he fixed the pistol Ray asked him for some bullets. He gave Ray some bullets around 6:30 or 6:45 p.m. that night and Ray left the house. Ray fired the gun in the air once as he left the house. He recognized State's Exhibit No. 6, the pistol, as the automatic pistol Ray had and took with him on 7 December 1966. It was the pistol he unjammed for Ray. He was at home when Detective Upchurch of the Durham police force came there on 12 December 1966 and arrested Ray. State's Exhibit No. 6, the pistol, was found behind the pillow of the sofa in the front room after defendant was arrested. Ray had been sitting on the couch just before his arrest.

When defendant Ray was searched at the county jail after his arrest, a watch was found in the watch pocket of his trousers. The chain on it was broken. Mrs. Daily testified that the wrist watch taken from Ray's pocket was the Bulova watch which she was wearing on the night she was raped, and she identified the watch by scratches on the top of the crystal of the watch.

Defendant assigns as error the denial of his motion aptly made to quash the indictment for the reason that he is a Negro and Negroes were excluded from service upon the grand jury that returned the indictment against him solely by reason of their race, in violation of the equal protection clause of the 14th Amendment to the United States Constitution and Article I, section 17, of the North Carolina Constitution.

[1, 2]  It is hornbook law that a valid indictment is a condition precedent to the jurisdiction of the Superior Court to determine the guilt or innocence of the defendant, and to give authority to the court to render a valid judgment. North Carolina Constitution, Article I, section 12; *S. v. Yoes and Hale v. State*, 271 N.C. 616, 157 S.E. 2d 386; *S. v. Bissette*, 250 N.C. 514, 108 S.E. 2d 858. An indictment returned by a grand jury not legally constituted is not a valid indictment. *S. v. Wilson*, 262 N.C. 419, 137 S.E. 2d 109.

**[3]**    It is no longer open to question that in the United States and in the State of North Carolina a conviction of a Negro cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race. *S. v. Covington,* 258 N.C. 495, 128 S.E. 2d 822; *Miller v. State,* 237 N.C. 29, 74 S.E. 2d 513; *Whitus v. Georgia,* 385 U.S. 545, 17 L. Ed. 2d 599; *Eubanks v. Louisiana,* 356 U.S. 584, 2 L. Ed. 2d 991; *Reece v. Georgia,* 350 U.S. 85, 100 L. Ed. 77.

**[4]**    The burden is upon the defendant to establish the racial discrimination alleged in his motion to quash the indictment. *S. v. Lowery and S. v. Mallory,* 263 N.C. 536, 139 S.E. 2d 870; *S. v. Wilson, supra; S. v. Covington, supra; Miller v. State, supra; Whitus v. Georgia, supra; Akins v. Texas,* 325 U.S. 398, 89 L. Ed. 1692; *Fay v. New York,* 332 U.S. 261, 91 L. Ed. 2043. However, once a *prima facie* case is made out the burden shifts to the prosecution. *S. v. Wilson, supra; Whitus v. Georgia, supra.*

**[5]**    A jury list is not discriminatory merely because it is made from the tax list. *S. v. Lowery and S. v. Mallory, supra; Brown v. Allen,* 344 U.S. 443, 97 L. Ed. 469. However, it is better practice to supplement such list by resorting to voter registrations and other available lists.

**[6]**    The indictment in this case was returned at the April 1967 Session of Superior Court of Durham County. Defendant in support of his motion to quash the indictment against him upon the ground of alleged racial discrimination introduced evidence in substance as follows:

The names for service on the grand jury selected in February 1967 were drawn from the number one side of the jury box in Durham County in June 1966. The sheriff selected 50 or 52 names from the number one box for jury service, of which the first nine names drawn from a hat by a child serve on the grand jury. (Nine grand jurors are drawn in January of each year and nine grand jurors are drawn in July of each year, but there are always eighteen grand jurors serving. G.S. 9-22.) The jury box is purged every two years in Durham County, the last time being some 18 months prior to April 1967. The jury list from which both sides of the jury box are made up is provided by Arista Data Processing Company from the names on the tax rolls, which Arista also compiles from information furnished by the county. The key punch operators in the tax supervisor's office in Durham County punched name and address cards from each tax abstract, as signed by the taxpayer, and this is the

source document from which Arista made up the tax list, from which it compiled the jury list.

Arista was instructed by Murray Upchurch, assistant county accountant of Durham County, to make up the jury list from all the names on the tax rolls without regard to race or sex, and to be sure that there were no identifying words on the slips of paper which would tend to identify the persons as to race. Some 58,000 names were on the list compiled by Arista. The list was cut into strips containing one name and address on each, and these strips were placed in a box which was turned over to the sheriff. Mr. Upchurch testified that he inspected the list and was satisfied that Arista had complied with his instructions. The race of the individual taxpayer does appear on the tax abstract reference, and was known to the person or persons making up the tax information supplied to Arista. However, no names were deleted before sending the list to Arista.

Alton Gamble, programmer and assistant handler for Arista Data Processing Company, testified that in order to make the jury list Arista took the same magnetic tape that they used in producing the tax bills and printed each person's name that listed taxes; that no names were eliminated from the list except nonresidents and corporations; and that there were no designations as to race or creed appearing on the jury list. The magnetic tape from which the jury list was made does contain the race of the taxpayer. On cross-examination, Gamble agreed that it is possible with data processing equipment to eliminate names with racial identifying codes on them.

J. M. Mangum, sheriff of Durham County, testified that he had been affiliated with the sheriff's department of Durham County for 34 years, and that during these years he had been in and out of the courtroom at most of the criminal terms; that he had observed as many as three Negroes on the grand jury at one time; that he could not recall a time when he had observed more than three Negroes on the grand jury.

The court made the following finding of fact: "And upon said evidence the Court finds as a fact that Negroes under the procedure followed in the obtaining of the list of jurors from which the Grand Jury that returned said bill of indictment was drawn were not excluded from service upon said Grand Jury solely by reason of their race in violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution, and Article I, Section 17, of the Constitution of North Carolina." Whereupon, the trial court denied the defendant's motion to quash the indictment.

Defendant contends that the names of taxpayers were listed in racially designated books prior to 1966, which provided ample opportunity for selection by race on the part of the personnel responsible for supplying names for jury lists, all of whom were white. There is no evidence in the record to support defendant's assertion in his brief that all persons who were responsible for supplying the names for the jury list were white. Nor is there evidence that racially segregated books were used prior to 1966. Defendant further contends that as the tax returns of individuals bear a designation as to race there was ample opportunity for discrimination in the selection of names to be placed in the jury box from which the grand and petit jurors are drawn. The contention ignores evidence that Arista Data Processing Company was instructed to compile their jury list without regard to race or sex, and to be sure that there would be no identifying words on the slips of paper comprising the jury list which would tend to identify a person's race. It also ignores the testimony of Alton Gamble, programmer and assistant handler for Arista, that there were no designations as to the race or creed appearing on the jury list that was prepared for Durham County. Defendant's contention also ignores the testimony of Murray Upchurch, assistant Durham County accountant, that he was satisfied by his inspection of the jury list that his instructions to Arista that there were to be no designations as to race or creed appearing on the list had been complied with.

[7]    There is no evidence at all in the record as to the number of Negroes in Durham County and the number of white persons. The United States census for 1960 gave the population of Durham County as 111,995. According to defendant's own evidence, some 58,000 names of prospective jurors were in the jury boxes of Durham County. This is over half of the population of the county. When consideration is given to the fact that a large percentage of the residents of the county are persons under 21 years of age, a jury list containing the names of over half of the population of the county is some evidence in itself that there was no discrimination in the preparation of the list.

There is no evidence as to how many Negroes have served upon the grand jury and the petit juries of Durham County. Sheriff Mangum testified that in the 34 years he had been connected with the sheriff's department of Durham County he had observed as many as three Negroes on the grand jury at one time.

There is no evidence in the record before us that any qualified Negro was racially discriminated against in the preparation of the

jury list for Durham County either in the selection of the first nine jurors who found the indictment in this case or in the case of the last nine jurors who found the indictment in this case.

The two counsel appointed by the court to represent defendant in this case are experienced lawyers with many years practice in the county of Durham. If there had been any racial discrimination in the jury list of Durham County, it is a reasonable, if not certain, inference that they would have produced it. They did not do so.

The method of the preparation of the jury list and drawing of the original panel is set forth in G.S. 9-1 through G.S. 9-5 inclusive. It seems to have been substantially followed in this case. Conjecture with not a shred of evidence to support it is not a basis for judicial determination.

[6]   In our opinion, and we so hold, defendant has totally failed to make out a *prima facie* case of the exclusion of Negroes from service upon the grand jury that found the indictment against him in this case.

The court properly denied defendant's motion to quash the indictment and his assignment of error thereto is overruled.

[8]   Defendant then moved to quash the array of the petit jury. Upon that motion he introduced no evidence but relied upon the evidence that he had introduced as to the composition of the grand jury. This motion was denied by the court and the defendant excepted. Defendant has not assigned the denial of the motion to quash the array of the petit jury as error and has not brought it forward and discussed it in his brief. For the reasons assigned above the motion to quash the array of the petit jury was properly denied. As the denial of this motion has not been brought forward in an assignment of error and discussed in the brief of defendant, it is deemed to be abandoned. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 810.

[9]   After defendant's motion to quash the indictment had been denied, he made a motion, pursuant to the provisions of G.S. 1-84, that his case be transferred to some adjacent county for trial. In support of his motion he filed two affidavits — one made by himself and a joint affidavit made by his attorneys of record, C. C. Malone, Jr., and R. Roy Mitchell, Jr. These affidavits are in substance as follows: That there are probable grounds to believe, and they believe, that the defendant cannot obtain a fair and impartial trial in Durham County for the reason that the defendant is a Negro man and the prosecuting witness is a white woman and she as well as her

STATE *v.* RAY

husband are members of families of some importance in the community, causing much discussion among the citizens of Durham County; that there has been wide coverage by all phases of the news media including radio, television, and newspaper articles about the case; and that the circulation of such news has spread to such an extent that it would be difficult, if not impossible, to obtain jurors in Durham County who have not read about, or observed on television the defendant in custody of police officers, from which various persons in the county have no doubt formed conclusions as to the guilt or innocence of the defendant. In the statement of the case on appeal it is stated that the defendant "offered affidavits of counsel and newspaper clippings showing the widespread publicity given the case in the news media throughout the country (sic)."

The following appears in the statement of the case on appeal in substance except when quoted: After hearing the argument of counsel the court then in open court interrogated the jurors as to whether or not they had read about, heard by radio, or seen on television anything about the case. The court then read the bill of indictment charging rape and requested all jurors in the courtroom to raise their hands if they recalled having read, heard or seen anything in the news media about the case. About fifty per cent of the jurors present raised their hands. "Whereupon, at the request of defense counsel, the Court informed the Jurors that the evidence would show that a young woman was kidnapped from the Sears Roebuck parking lot and carried off, then inquired of those jurors who had not previously raised their hands if they recalled having heard, read or seen anything about the case in the news media in the country (sic), whereupon, almost all of the Jurors who had not previously raised their hands, did so; indicating that practically the entire Jury panel had read, heard or seen all of the publicity given the case." The defendant then through his counsel moved the court for a special venire from a contiguous county, and in support of said motion offered in evidence newspaper clippings and affidavits of attorneys as to radio and television coverage of the case. The record before us does not contain affidavits of attorneys, other than the defense attorneys, and no newspaper clippings referred to in the case on appeal.

There is nothing in the record to show or to suggest that any of the jurors had formed an opinion in respect to the guilt or innocence of the defendant. To hold that a prospective juror was disqualified for jury service in a particular case merely because he had read of it or listened to it over television or radio would mean that in a case

that was given publicity in the newspapers or on the radio and television, only the most illiterate or ignorant jurors would be qualified. That would be an absurd result.

The brief of defendant's counsel signed by C. C. Malone, Jr., states this:

> "The defendant submits to this Honorable Court that he, a Negro, was charged originally with the offenses of rape, kidnap, and common law robbery, which offenses were alleged to have been committed upon the person of a young white woman, a member of an old, substantial and well respected family in the community, and a member of which family was well known throughout the county as a successful and respected merchant. All of which facts would engender a much more than passing interest in the case throughout the community, coupled with the fact that the defendant was a Negro of dubious background, an indigent and escaped felon; all of which combined in this case in a manner so as to inflame the passions and tempers of the various citizens throughout the community to a degree perhaps unparalleled in recent annals in and around the county."

The defendant did not testify at any stage· of the proceedings. There is nothing in the record before us to substantiate the fact stated in his brief that he is of dubious background and an escaped felon except a statement of Wallace Upchurch, a police officer, who testified on the *voir dire* in the absence of the jury that defendant was an escaped felon. There was no objection by defendant's counsel to the statement of Upchurch on the *voir dire*. The court denied defendant's motion. It appears in the record that in addition to the regular jurors a special venire of 100 persons was summoned as prospective jurors. The State filed no affidavits in the case. Defendant assigns as error the denial of his motion.

[10] The record fails to disclose that defendant had exhausted his peremptory challenges or that any juror was accepted to which he had legal objection on any ground. It is well settled that a defendant on trial has the right to reject any juror for cause or within the limits of his peremptory challenges before the panel is completed. *S. v. McKethan,* 269 N.C. 81, 152 S.E. 2d 341.

[9] Defendant's motion for a change of venue was addressed to the sound legal discretion of the trial court. *S. v. Brown,* 271 N.C. 250, 156 S.E. 2d 272; *S. v. McKethan, supra; S. v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *S. v. Scales,* 242 N.C. 400, 87 S.E. 2d 916; *Irvin v. Dowd,* 366 U.S. 717, 6 L. Ed. 2d 751; *Reynolds v. United*

*States,* 98 U.S. 145, 25 L. Ed. 244. The record fails to disclose that the trial judge abused his discretion in denying the motion. This assignment of error is overruled.

Defendant introduced no evidence, except on his motion to quash the indictment and on his motion for a change of venue.

The State introduced evidence tending to show in substance the following, some of which has been stated above: Defendant was permitted to sleep in the living room of the home of Mary Ann Gibson and her husband Alden Gibson. Defendant was unemployed. Alden Gibson considered him as a friend, and he never charged him anything for living in his home. He and defendant drank together, and Gibson's wife prepared meals for defendant. He paid no rent and did not have a key to the house except when Mary Ann Gibson was out. At all other times she opened the door for him. For defendant's convenience Mary Ann Gibson let defendant keep his clothes in one of her suitcases which was kept in another room of the house. About dark on the night of 7 December 1966 defendant left the house wearing a dark blue pull-over sweater and overalls. He returned after nine o'clock wearing the same clothes, and it appeared to Mrs. Gibson who opened the door for him that defendant had been running through bushes for his pants were full of briars. Defendant did not leave the house again until he was arrested on 12 December 1966. The officers had learned from Alden Gibson that defendant might have been the person wanted for the rape of prosecutrix Mrs. Daily. Defendant was personally known to Officer Upchurch. On the basis of their information the officers went to the Gibson home to arrest defendant. Alden Gibson invited the officers inside. Defendant was sitting in a chair in the living room and was arrested by the officers. The officers did not have a warrant for his arrest or a search warrant. On the night of the arrest, after defendant had been carried from the Gibson home, the officers asked Mrs. Gibson if defendant had any clothes. She then went into her bedroom and got the suitcase containing defendant's clothes from under the baby's crib and gave it to the officers. The suitcase was in Mary Ann Gibson's room over which defendant had no control. A sweater was taken from this suitcase. This sweater was received in evidence over the objection and exception of defendant, and defendant assigns its admission in evidence as error. This sweater was examined by the F.B.I. laboratory in Washington, D. C. On the lower front portion of this sweater and on the left sleeve of the sweater were reddish brown smears that showed from the laboratory tests of the F.B.I. they came from human blood. Defendant moved that the testimony

of what was found on the sweater in the F.B.I. laboratory be stricken out. The court denied this motion, and defendant assigns this as error.

The State introduced evidence of Robert E. Neill, a special agent with the F.B.I., whose particular specialty is the microscopic examination of hairs and fibers, textile material, and related materials in criminal cases. He testified in substance that he found on the sweater introduced in evidence and in the debris of Jeane Daily's automobile hair possessing Negro characteristics. Defendant assigns this admission in evidence over his objection and exception as error.

Jeane Daily testified on cross-examination that before going to Sears Roebuck and Company's store she had stopped at Eckerd's on Broad Street and purchased a carton of Winston cigarettes. The cigarettes and sales slip were placed in a brown paper bag, which she placed under the front seat on the driver's side of the car. She does not know of her own knowledge what became of the cigarettes. She was shown a paper bag with cigarettes in it and a sales slip marked State's Exhibit No. 9 which she identified as being in all respects similar to the cigarettes that she had purchased at Eckerd's and similar to the sales slip she had been given when she made the purchase. Mary Ann Gibson testified that defendant was carrying a brown paper bag when he returned to her house with his trousers full of briars. She also testified that the next day after defendant had been arrested and carried to jail she gave to the police the paper bag containing four packs of Winston cigarettes and an Eckerd's sales slip. Officer Upchurch testified that she gave them to him six days after his arrest. Mary Ann Gibson told the officers that they belonged to defendant and to give them to him as he had left them on the table the night before he was arrested. Defendant moved to strike this testimony of Mary Ann Gibson. His motion was overruled, and defendant excepted and assigned this as error.

[11]    Immunity from unreasonable searches and seizures is a personal right and one cannot object to the search of another's premises or property if the latter consents to the search, even though property is found for the possession of which defendant is subsequently prosecuted. S. v. Mills, 246 N.C. 237, 98 S.E. 2d 329; S. v. McPeak, 243 N.C. 243, 90 S.E. 2d 501, cert. den. 351 U.S. 919, 100 L. Ed. 1451; Annot., 31 A.L.R. 2d 1081, § 3 (1953); 79 C.J.S. Searches and Seizures § 52 (1952); 4 Wharton's Criminal Law and Procedure § 1530, (Anderson Ed., 1957).

The case of Spencer v. People (Supreme Court of Colorado en banc), 429 P. 2d 266, is in point. Spencer was arrested, tried and found guilty of burglary and larceny. These charges arose out of

the burglary of the Fountain-Fort Carson High School in Fountain, Colorado. The information charged that the defendant broke into the school, pried open the door of the school vault, pried open the safe which was in the vault, and stole a 16 millimeter movie camera and more than $600. The defendant was arrested on October 13, 1964. He told the police that he was staying at 106 West Brookside, an address in El Paso County. That night, several officers went to the address given by the defendant and were admitted into the house by the occupant, a Mrs. Henderson. She showed the officers a bedroom where the defendant had been staying. In response to a request by the officers for property belonging to the defendant, Mrs. Henderson produced the camera in question and handed it to the officers. The officers left the premises without taking the camera with them. At about noon the next day, October 14, 1964, the officers returned to the house and asked Mrs. Henderson if she would be willing to give them the camera. She did so voluntarily. At no time did the officers obtain a warrant to search the house or to seize the camera. Mrs. Henderson did not object to the presence of the officers in her home on either day and she did, in fact, freely aid them in the search. The record shows that defendant was staying at Mrs. Henderson's home at her invitation. The record also shows that the bedroom in question was open to access by anyone in the house since there was no door between the bedroom and the rest of the house, or at least there was no closed or locked door at the time of the visits by the officers. One of the officers testified that he saw articles of clothing, which apparently belonged to Mrs. Henderson, in the closet in the defendant's bedroom. The Court said in its opinion:

"There is no assertion that this search was made under a search warrant, or with the consent of the defendant, and the premises searched clearly were not the scene of the arrest of the defendant. Therefore, the validity of the search depends on the consent given by Mrs. Henderson. See *Smuk v. People,* 72 Colo. 97, 209 P. 636. The record clearly shows that Mrs. Henderson did give her consent to the search on both occasions, and it is also clear that she actively aided the officers in looking through the bedroom. We hold that the consent given by Mrs. Henderson was sufficient to make the search valid and constitutional. Mrs. Henderson resided in the house with her five year old daughter. Mrs. Henderson was either the owner of the house, or was at least the person in full control of the house. And, it is important to note, the record also shows that she had the right of unlimited access to the bedroom in question. Under these circumstances, her consent was valid. The apparent owner of the prop-

erty who has equal rights to the use of the premises and has equal access to the premises may legally authorize a search of those premises. *Woodard v. United States,* 102 U.S. App. D. C. 393, 254 F. 2d 312 (1958), cert. denied, 357 U.S. 930, 78 S. Ct. 1375, 2 L. Ed. 2d 1372; *Calhoun v. United States,* 172 F. 2d 457 (5th Cir. 1949), cert. denied, 337 U.S. 938, 69 S. Ct. 1513, 93 L. Ed. 1743; *People v. Gorg,* 45 Cal. 2d 776, 291 P. 2d 469; *People v. Howard,* 166 Cal. App. 2d 638, 334 P. 2d 105; *Van Wyck v. State,* 56 Okl. Cr. 241, 37 P. 2d 321; Annot., 31 A.L.R. 2d 1078 (1953) §§ 3, 6. And see, *Burge v. United States,* 342 F. 2d 408 (9th Cir. 1965), cert. denied 382 U.S. 829, 86 S. Ct. 63, 15 L. Ed. 2d 72; *People v. Swift,* 319 Ill. 359, 150 N.E. 263. The seizure of the camera and the later introduction of it into evidence were proper."

*Calhoun v. United States,* 172 F. 2d 457 (5th Cir. 1949), reh. den. 15 March 1949, is another case in point. In that case the Court held as summarized in the third headnote in the National Reporter Series:

"Where owner voluntarily gave police officers permission to search house without a warrant, defendant could not complain of search of a room therein which he was permitted to occupy whenever he happened to be there but which he did not own or rent and over which he had no authority when not personally occupying it."

The Court in its opinion said:

". . . As to the appellant Calhoun, who complained that his shoes were taken from his room, the record discloses that no shoes were introduced in evidence. Moreover, it does not appear that Calhoun either owned or rented the room in question. The best that can be said of Calhoun's occupancy of this room is that he was permitted to use it whenever he happened to be there. So far as appears, he had no authority over this room when he was not personally occupying it. The owner and master of the house was the witness Tomme. The latter voluntarily gave the officers permission to search his home without a warrant, and voluntarily turned the money over to the post-office inspector.

"We find no reversible error in the record, and the judgment appealed from is affirmed."

**[12]**    In the instant case the defendant did not own, lease, control or possess the Gibson house but was permitted to sleep in the living

room in that house. He paid no rent and did not have a key to the house except when Mary Ann Gibson went out. At all other times she opened the door for him. For defendant's convenience Mary Ann Gibson let defendant keep his clothes in one of her suitcases which was kept in another room of the house. On the night of the arrest, after defendant had been carried from the Gibson house, the officer asked Mrs. Gibson if defendant had any clothes. She then went into her bedroom and got the suitcase containing the defendant's clothes from under the baby's crib and voluntarily gave it to the officers. The sweater was taken from this suitcase by the officers. While it is not crystal clear from the record that defendant was wearing this sweater at the time of the alleged rape, yet in our opinion a jury could draw a fair inference from the evidence that he was wearing this sweater at the time of the alleged rape. We are fortified in our opinion by the fact that defendant's experienced counsel makes no suggestion to the contrary in his brief. Under these facts the taking of this sweater by the officers was not the result of an unlawful search and seizure, and the sweater was properly and correctly admitted in evidence.

[13]   The State introduced evidence in this case tending to show that defendant was guilty of the crime of rape upon the body of Mrs. Jeane Daily, and that after the commission of the crime of rape Mrs. Daily had blood on her legs. There is also evidence in the record that on the night in question she was on the second day of her menstrual period. The trial court properly refused to strike out the evidence that laboratory tests of the F.B.I. showed that on the lower front portion of the sweater and on the left sleeve of the sweater turned over to the police by Mary Ann Gibson were reddish brown smears that came from human blood, for the simple reason that the jury could make a reasonable inference from the evidence that the sweater was a garment worn by the defendant at the time named in the indictment, and bore stains corroborative of the State's theory of the case. *S. v. Speller,* 230 N.C. 345, 53 S.E. 2d 294; *S. v. Bass,* 249 N.C. 209, 105 S.E. 2d 645; *People v. Hartley* (Dist. Ct. of Appeals), 17 Cal. Rptr. 286. For the same reason the court properly admitted into evidence the testimony of a special agent of the F.B.I., whose particular specialty is the microscopic examination of hairs and fibers, textile material, and related materials in criminal cases, that on the sweater introduced in evidence there was hair possessing Negro characteristics. *Nicholas v. State* (Court of Criminal Appeals), 270 S.W. 555; *People v. Kirkwood,* 17 Ill. 2d 23, 160 N.E. 2d 766; 75 C.J.S. Rape §§ 47 and 59.

[14]   The court properly admitted into evidence the expert testi-

mony that hair possessing Negro characteristics was found in the debris of Mrs. Jeane Daily's automobile where the alleged rape took place. Certainly no constitutional rights of defendant were violated by the search of Mrs. Jeane Daily's automobile.

[15] Defendant assigns as error the failure of the court to sustain defendant's objection and motion to strike testimony regarding a paper bag containing cigarettes and a sales slip, as set forth above with particularity, on the ground that this evidence was obtained as a result of an illegal search and seizure. The evidence indubitably discloses that these cigarettes were given by Mary Ann Gibson to the police to carry to the prisoner. She evidently thought he smoked cigarettes and gave the officers the cigarettes to carry to defendant. These cigarettes under the circumstances were not obtained as a result of an unlawful search and seizure. Defendant's objection and exception were properly overruled.

All defendant's assignments of error are overruled. In the case below we find.

No error.