STATE OF NORTH CAROLINA v. BOBBY TYSON
—and—
STATE OF NORTH CAROLINA v. HAROLD DOUGLAS GAINES

No. 61

(Filed 14 April 1971)

1. Robbery § 5— armed robbery — instruction on lesser included offense

Trial court in an armed robbery prosecution was not required to instruct the jury on the lesser included offense of common law robbery where there was no evidence to support such an instruction.

2. Criminal Law § 66— in-court identification testimony — admissibility

Trial court's findings that the in-court identification of the two defendants charged with armed robbery was based upon the victim's observation of defendants at the time of the robbery and was untainted by any suggestive identification procedures, *held* supported by the uncontradicted evidence on the *voir dire.*

3. Criminal Law § 66— in-court identification testimony — contention that witness was disqualified

Defendants' contention that a robbery victim came to the courtroom mentally preconditioned to identify as the robbers whoever might be the defendants on trial and that the victim should have been disqualified from giving identification testimony, *held* without merit.

APPEAL by defendants from *Thornburg, S.J.,* at the 21 September 1970 Session of STANLY, heard prior to determination by the Court of Appeals.

Under four separate indictments, two against each defendant, each proper in form, consolidated for trial, the defendants were tried upon charges of robbery of Marvin Furr and Lloyd Clodfelter with the use of firearms. Each defendant was found guilty as charged in each case. Tyson was sentenced to imprisonment for 20 years in each case. Gaines was sentenced to imprisonment for 25 to 30 years in each case. Since none of the judgments states to the contrary, the sentences imposed on each defendant will run concurrently. Both defendants appealed, their assignments of error being identical.

The evidence of the State, which consisted entirely of the testimony of Furr and Clodfelter, was to the following effect:

On 13 January 1970, at about 4 p.m., Clodfelter stopped at and entered the filling station store operated by Furr. When he arrived, six Negro men were there and Furr was outside pumping gasoline into their car. The two defendants, each positively

identified in court both by Clodfelter and by Furr, were two of those men.

Five of the Negro men and Furr thereafter followed Clodfelter into the store, one of the six remaining in the car as driver. A discussion arose when it developed that the men did not have enough money to pay for the gasoline. Furr refused to accept a check and went outside to make a note of the license number of the car.

While Furr was outside, Tyson "pulled a gun" on Clodfelter, grabbed him around the neck, held the gun at his head and pushed him over behind the door, saying, "If you move, damn you, I'll blow your brains out." Furr then reentered the store and the other Negroes grabbed him. Tyson released his hold upon Clodfelter and, pointing his gun at Furr, demanded that Furr open the cash register after Tyson's own efforts to do so had failed. Furr opened the cash register and Tyson took the money out of it, about $100.

Gaines, who was one of those in the store when Tyson seized Clodfelter and when he forced Furr to open the cash register, went out to the car and returned with a shotgun. The group, at least one other member displaying a pistol, then "started rummaging the store," taking from it shotgun shells and other merchandise. Gaines twice suggested that they kill Furr and Clodfelter, each time lifting his gun as if to shoot, but Tyson said he did not want to do that unless he had to. Tyson and Gaines then took from Furr's person two pocketbooks, containing about $140, which Furr gave them because they had a gun on him.

Tyson and Gaines then marched Furr and Clodfelter out of the store and around to the men's room, which they forced Furr and Clodfelter to enter. They then discovered the door could not be locked from the outside. Furr having locked it from the inside, Gaines threatened to shoot through the door if Furr did not open it, which Furr did. Tyson and Gaines then compelled Furr and Clodfelter to reenter the store and to lie down on the floor, Tyson first taking from Clodfelter's pocket his billfold, from which Tyson removed and put into his own pocket $110. While this was being done, Tyson held a pistol in his hand and Gaines stood by, pointing a shotgun in the faces of Clodfelter and Furr.

Tyson, Gaines and their companions then tore out the telephone and drove away. Their stay in the store lasted fifteen or twenty minutes.

While neither Furr nor Clodfelter had ever seen either defendant prior to this occurrence, each had opportunity, while the robberies were in progress, to observe both defendants. After the robberies, neither witness saw either defendant prior to trial, except that both saw Tyson at his preliminary hearing some weeks prior to trial. At the preliminary hearing both recognized Tyson as he entered the courtroom with a deputy sheriff and took his seat alone in the prisoners' box. No one then told them that Tyson was one of the group which had robbed them. Each witness testified at the trial that his recognition of Tyson at the preliminary hearing was not the basis for his in-court identification of him.

The defendants offered no evidence.

Neither defendant objected, at the time, to the in-court identifications by Furr or by Clodfelter. After Furr had completed his testimony and before Clodfelter took the stand, the court, on its own motion and in the absence of the jury, conducted a *voir dire* to determine the basis of Furr's in-court identifications of the two defendants. On this *voir dire* Furr and Tyson testified, no other evidence being taken. The testimony on *voir dire,* in substance, was as follows:

Tyson's testimony was limited to his hair style at the time of the alleged robberies and to whether or not he then had a mustache.

Furr's testimony on *voir dire* was that the robberies occurred on a fair day; his store was then well lighted; the defendants were in his presence fifteen or twenty mintes; he looked at Tyson's face when Tyson proposed to write a check for the gasoline; Gaines was then within two feet of Furr; at the time of the robberies Furr paid attention to Gaines because Gaines was the one who wanted to shoot him; Furr's in-court identifications were based on the way the defendants looked at the time of the robberies; no police officer or anyone else ever pointed out either Tyson or Gaines to Furr as being members of the group which robbed him; Furr was not asked to testify at Tyson's preliminary hearing and did not do so or then point out Tyson to anyone or make any statment concerning him; no

photograph of Tyson has even been placed before him; no one ever pointed out either defendant to him as one of the group which robbed him; he has never seen either defendant in any line-up of any kind; a mental picture of Tyson has remained in Furr's mind ever since Tyson pointed the automatic pistol at him during the robberies; the only time Furr saw Tyson between the robberies and the trial was at the preliminary hearing; Gaines was not then in custody; and Furr did not see Gaines from the time of the robberies until the trial.

At the conclusion of the *voir dire*, the court entered an order setting forth findings of fact, including a finding that there is nothing in the record to indicate any suggestion by any member of any law enforcement agency "which would color the identity of the two defendants as indicated by the witness Furr," and the finding that there is nothing in the record to indicate any illegal identification procedures or line-ups involving these two defendants while in the custody of law enforcement officers. The court concluded that there was no impermissibly suggestive procedure used to aid Furr in identifying the two defendants and his in-court identifications of them are independent in origin and are admissible in evidence.

*Attorney General Morgan and Assistant Attorney General Hudson for the State.*

*Ernest H. Morton, Jr., for defendant Bobby Tyson.*

*W. T. Hudson for defendant Harold Douglas Gaines.*

LAKE, Justice.

The defendants have brought forward in their brief only those assignments of error which relate to the admission of the in-court identifications of them by the witness Furr and to the failure of the trial court to instruct the jury concerning the offense of common law robbery. The other assignments of error set forth in their statements of the case on appeal are, therefore, deemed abandoned. *State v. Ray,* 274 N.C. 556, 164 S.E. 2d 457; *State v. Spears,* 268 N.C. 303, 150 S.E. 2d 499; Strong, N. C. Index 2d, Criminal Law, § 166. We have, nevertheless, considered all of the assignments of error and we find no merit in those so abandoned by the defendants.

[1] There was no error in the failure of the court to charge the jury as to the offense of common law robbery. Although this is

an offense included in the offense of robbery with the use of firearms so that the indictments would have supported convictions thereof, *State v. Rowland,* 263 N.C. 353, 139 S.E. 2d 661, there was no evidence whatever of any robbery except with the use of firearms. In such case the law does not require an instruction as to the lesser offense and there was no error in instructing the jury to return, as to each defendant in each case, a verdict of guilty of robbery with the use of firearms or a verdict of not guilty, which the court did. *State v. Williams,* 275 N.C. 77, 88, 165 S.E. 2d 481; *State v. Bridges,* 266 N.C. 354, 146 S.E. 2d 107; *State v. Hicks,* 241 N.C. 156, 84 S.E. 2d 545; Strong, N. C. Index 2d, Criminal Law, § 115.

[2] There is, likewise, no merit in the contention that the court erred in finding and concluding that the in-court identification of each defendant by the witness Furr was independent in origin and untainted by any suggestive procedures by law enforcement officers. There is nothing whatever in the record to suggest, even remotely, that there was any line-up, or any display of photographs of either defendant or of the person of either defendant to this witness by any officer or employee of any law enforcement agency. The witness' testimony is clear and positive to the contrary and is sufficient to show ample opportunity for him to observe both defendants at the time of the robberies. The only time he saw the defendant Tyson between the date of the robberies and the commencement of the trial was at Tyson's preliminary hearing on these charges. He never saw the defendant Gaines between the date of the robberies and the commencement of the trial, Gaines having waived a preliminary hearing according to his counsel's brief. The uncontradicted evidence on the *voir dire* is ample to support the trial court's findings of fact. These are, therefore, binding upon us. See: *State v. Jacobs,* 277 N.C. 151, 176 S.E. 2d 744; *State v. Gray,* 268 N.C. 69, 79, 150 S.E. 2d 1; Strong, N. C. Index 2d, Criminal Law, § 76, p. 586. The court's findings of fact support its conclusion that the identifications of both defendants by the witness Furr were admissible in evidence.

Furthermore, neither defendant objected to Furr's in-court identification of him when it was put in evidence and neither objected to the equally positive and unequivocal identifications by the witness Clodfelter. See Stansbury, North Carolina Evidence, 2d Ed., § 27. Nothing in the record indicates that anything transpired after the in-court identification of Tyson by the wit-

ness Furr to cast doubt upon its admissibility. Nevertheless, the trial judge, out of an abundance of caution, made inquiry, in the absence of the jury, into the possibility of impermissibly suggestive police methods leading to some prior identification of the defendant Tyson by this witness. Tyson's testimony on the *voir dire* suggested nothing whatever of this nature. The testimony on *voir dire* by the witness shows clearly there was no effort by anyone to lead him into an identification of either defendant as one of the robbers.

[3] In their brief the defendants argue that when the witness Furr came to the courtroom for the trial, he necessarily knew the defendants were charged with robbing him and so, of course, expected to see in the courtroom men whom the law enforcement officers believed were the robbers. Consequently, they say, the witness came to the courtroom mentally preconditioned to identify as members of the group which robbed him those whom he saw in the courtroom charged with the offense. This, they contend, disqualifies the witness to testify that the persons he saw there were, in fact, the ones who robbed him.

This contention is an amplification of *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149, which has the support of no decision by any court thus far called to our attention. To accept it as a correct application of the Fourteenth Amendment to the United States Constitution would, of course, make it impossible for the victim or any other eye witness to a crime to testify that he recognizes the defendant as its perpetrator, without first having, for each witness, some sort of line-up procedure to test his recollection of the perpetrator's appearance. This is not required. See, *State v. Jacobs, supra*. The decision in the Wade case was designed to promote fairness in the use of line-ups, not to require them. The contention of the defendants is predicated upon the assumption, completely unsupported by anything in the record, that the witness came to court prepared to identify as the one who robbed him whomsoever might be the defendant on trial. It overlooks the obvious truth that when the victim of a crime comes to court to testify, his motivation is his desire to bring the actual wrongdoer to justice, which purpose would be defeated by his identification of someone else as the perpetrator of the crime.

No error.