STATE OF NORTH CAROLINA v. BERNARD AVERY

No. 34

(Filed 1 February 1980)

**1. Constitutional Law § 60; Grand Jury § 3.3; Jury § 7.4— use of voter registration and tax lists—random selection by computer—no systematic exclusion of blacks—cross-section of community**

There was no systematic exclusion of blacks from the grand and petit juries in violation of the Equal Protection Clause of the Fourteenth Amendment where blacks constituted 24% of the population of the county, the use of voter registration and tax lists in selecting the jury pool resulted in a jury pool with 15% blacks, and a computer randomly selected every 2nd, 4th, 8th, 12th and 15th name from the master jury list, since there was only a 9% deviation between the percentage of blacks in the county and the percentage of blacks in the jury pool, and there was no subjective or discretionary selection of jurors by the jury commissioners. Nor did selection of the jury pool in such manner violate defendant's right to be tried by a jury drawn from a representative cross-section of the community as guaranteed by the Sixth Amendment and applied to the states through the Fourteenth Amendment.

**2. Constitutional Law § 63; Jury § 7.11— exclusion of jurors for capital punishment views—answers not equivocal**

The trial court did not err in allowing the State's challenge for cause of two prospective jurors who answered "I don't believe I would" and "I don't think so" when asked whether they could comply with the court's instructions and impose the death penalty if the evidence so required, since the phrasing of the jurors' negative responses did not equivocate their refusal to follow the law as given by the court to such an extent as to make their challenge for cause improper.

**3. Constitutional Law § 63; Jury § 7.11— exclusion of jurors for capital punishment views—cross-section of community**

Defendant was not deprived of a jury composed of a fair cross-section of the community by the exclusion of jurors who indicated that they could not impose the death penalty under any circumstances, there being no evidence that a jury qualified pursuant to the *Witherspoon* decision is prosecution prone or biased against Negroes and the lower economic classes.

**4. Criminal Law § 46.1— instruction on flight—supporting evidence**

The trial court's instruction on flight in a murder prosecution was supported by evidence that defendant admitted to two witnesses that he killed a cab driver and that defendant went to New York a few days after the crime, and the fact that defendant was originally from New York and the inference could be drawn that he was returning home did not render the instruction on flight improper.

Justice Exum dissenting.

APPEAL by defendant from *Snepp, J.* Judgment entered 7 December 1978 in Superior Court, MECKLENBURG County.

By indictments proper in form defendant was charged with first degree murder and with robbery with a dangerous weapon. On pleas of not guilty the jury found the defendant guilty of first degree murder and of robbery with a dangerous weapon.

After the verdicts were returned the trial court ruled that the armed robbery conviction merged with the first degree murder conviction.

Thereafter the question of whether defendant should be sentenced to death or to life imprisonment was submitted to the jury. Upon the jury being unable to agree upon a sentence recommendation within a reasonable time the trial judge, pursuant to G.S. 15A-2000(b), sentenced defendant to the State's prison for a minimum and maximum term of life.

The evidence for the State tended to show the following. On the evening of September 4, 1977 the defendant and Andre Sharpe went to the home of the defendant's cousin Rick Fuller. From Fuller they obtained a .22 caliber pistol and bullets. At about 11:00 p.m. that evening the defendant and Sharpe visited the home of Ella Currance. At the Currance residence the defendant engaged in an argument where he fired three to five shells from the .22 pistol into the ceiling. Following this altercation Sharpe and defendant Avery left the Currance's home and drove in Sharpe's car towards the Charlotte airport. Near the airport the defendant got out of Sharpe's car for the purpose of stealing an automobile but for an unknown reason he did not do so.

Sometime between 4:30 and 5:00 a.m. on the morning of September 5, 1977, Sharpe and Avery returned to the home of Ella Currance. There the defendant placed a call to Checker Cab Company and the dispatcher of the cab company dispatched Robert L. Moses in answer to the call. After phoning for the cab the defendant and Sharpe left the Currance's home. Having driven approximately two blocks, Sharpe pulled off the road, parked in a man's front yard and went to sleep. Sharpe was awakened by the sound of a pistol shot and when he woke up he found the defendant was not in the car. Sharpe drove towards the sound of the shot and arrived as the defendant was pulling

Robert Moses onto the ground from the driver's seat of a Checker Cab. Sharpe pulled up next to the cab and told the defendant "let's go." The defendant got into the car holding the .22 caliber pistol, a light blue jacket he had not had before and other articles of clothing.

The State's evidence further tended to show that Robert Moses was shot to death in the back of the neck and head by bullets from a .22 caliber pistol which could have been fired from the .22 caliber pistol which was in the possession of the defendant.

After leaving the cab the defendant and Sharpe went to a house on Marene Avenue in Charlotte where the defendant told Sharpe that he twice shot the driver Robert L. Moses. The defendant had a wallet containing Moses' driver's license and approximately $200 in cash.

On September 7, 1977 the defendant told John Lee Stewart, a friend of Sharpe's, that he had shot the cab driver in the head and neck. On September 7, 1977 the defendant and Sharpe left Charlotte for New York City.

*Attorney General Edmisten by Assistant Attorney General Charles M. Hensey for the State.*

*Chambers, Stein, Ferguson & Becton by James C. Fuller, Jr., for the defendant-appellant.*

BROCK, Justice.

In his first argument to this Court defendant-appellant contends that the trial court denied him his Fourteenth and Sixth Amendment rights in failing to quash an allegedly discriminatory jury venire. Defendant contends that he made a prima facie showing of constitutional violations and thus the burden shifted to the State to rebut his prima facie case. For the reasons which follow we hold the defendant did not make such a showing.

[1] The defendant brings forward an equal protection argument as well as an argument that he was denied a jury from a fair cross-section of the community. Defendant interchangeably cites numerous United States Supreme Court opinions as supporting both these contentions. In *Whitus v. Georgia*, 385 U.S. 545, 550,

17 L.Ed. 2d 599, 603, 87 S.Ct. 643, 646 (1967) in describing the defendant's claim of racial discrimination in violation of the Fourteenth Amendment the United States Supreme Court stated "[t]here is no question as to the constitutional principle. '[. . . [A] conviction cannot stand if it is based on a grand jury or a verdict of a petit jury from which Negroes were excluded by reason of their race.' 385 U.S. at 549, 17 L.Ed. 2d at 603, 87 S.Ct. at 646.] [T]he question involved is its application to the facts disclosed in this record."

The pertinent facts relating to the racial makeup of Mecklenburg County and the county's jury selection process follow. As prescribed by G.S. 9-2 the jury commissioners of Mecklenburg County used the tax list and voter registration list in compiling a master jury list. This raw list of 160,716 of which over 150,000 came from the voter registration list was fed into the computer of the Mecklenburg County data processing department which randomly selected every 2nd, 4th, 8th, 12th and 15th name. This selection produced a final list containing 53,572 names. A card was then punched by the computer for each name and these cards were alphabetized and locked in a file kept in the custody of the Mecklenburg County Register of Deeds. In his argument to this Court defendant-appellant is not questioning the validity of the selection system per se. This argument was raised earlier in *State v. Cornell*, 281 N.C. 20, 187 S.E. 2d 768 (1972) and this Court found that a jury list was not discriminatory nor unlawful simply because it was drawn from the tax list of the county. It is the racial composition of the list employed of which the defendant is complaining. In 1978 the total population of Mecklenburg County was 400,000 and of this total figure 24% were blacks. Defendant contends use of the tax lists and voter registration lists in selecting the jury pool fails to adequately represent Mecklenburg County's black population. In 1978 there were 240,000 persons possibly eligible to vote in Mecklenburg County, of these 184,293 persons were actually registered to vote. This figure of 184,293 may be broken down into 156,036 white voters and 28,257 black voters. In other words, 15% of the registered voters in Mecklenburg County were blacks. The evidence presented at the voir dire on defendant's motion to quash the jury pool showed that there was no attempt to discourage blacks from voting, and that voter registration was easily available. However when presented with

the opportunity 84% of the white population registered to vote while only 51% of the black population registered. The defendant offered evidence which tended to show the jury commissioners knew the percentage of black voters was lower than white voters. The defendant complains that the percentage of blacks on the tax list is even lower than the voter registration list but agrees that 15% black in the jury pool is a workable figure. Thus the statistics presented by the defendant show Mecklenburg County with a population of 24% black and a jury pool with a composition of 15% black. This creates a 9% deviation between the percentage of blacks in Mecklenburg County and the percentage of blacks in the jury pool. It is on these facts that we must determine the validity of defendant's claims of constitutional violation.

We turn first to defendant's Fourteenth Amendment right to be free from racial discrimination. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879) held that Negroes were an identifiable class, and as noted earlier if the defendant was convicted by a jury from which Negroes were systematically excluded on account of their race then his conviction cannot stand. *Whitus v. Georgia, supra; State v. Ray*, 274 N.C. 556, 164 S.E. 2d 457 (1968); *State v. Spencer*, 276 N.C. 535, 173 S.E. 2d 765 (1970). The defendant however is not entitled to a jury of any particular composition, nor is there any requirement that the jury actually chosen must mirror the community and reflect various and distinctive population groups. *Fay v. New York*, 332 U.S. 261, 91 L.Ed. 2043, 67 S.Ct. 1613 (1947); *Apodaca v. Oregon*, 406 U.S. 404, 32 L.Ed. 2d 184, 92 S.Ct. 1628 (1972). At the outset it must be noted that:

"... [T]he fact that a particular jury or a series of juries does not statistically reflect the racial composition of the community does not in itself make out an invidious discrimination forbidden by the [equal protection] Clause. 'A purpose to discriminate must be present which may be proven by systematic exclusion of eligible jurymen of the proscribed race, or by unequal application of the law to such an extent as to show intentional discrimination.' (Citations omitted.) *Washington v. Davis*, 426 U.S. 229, 239, 48 L.Ed. 2d 597, 607, 96 S.Ct. 2040, 2047 (1976). *See also Swain v. Alabama*, 380 U.S. 202, 13 L.Ed. 2d 759, 85 S.Ct. 824 (1965); *Duren v. Missouri*, 439 U.S. 357, 364, 58 L.Ed. 2d 579, 589, 99 S.Ct. 664, 668, n. 26 (1979); *Castaneda v. Partida*, 430 U.S. 482, 509-10,

51 L.Ed. 2d 498, 520, 97 S.Ct. 1272, 1288 (1977) (Powell, J.; dissenting)."

The evidence offered by the defendant in this case fails to show a discriminatory purpose on the part of the Mecklenburg County jury commission. In fact, the voir dire testimony tended to show exactly the opposite. Charles Williams, a jury commissioner, stated that the commission gave more weight to the voter list for it presented a fairer cross-section of the community. Presentation of this evidence which showed an attempt by the jury commission not to discriminate along with a showing that the jury commissioners followed the guidelines of G.S. 9-2 does not make a prima facie showing of purposeful systematic exclusion in violation of the Fourteenth Amendment.

Defendant relies on cases where the United States Supreme Court found an identifiable group was the subject of systematic exclusion. All of these cases are distinguishable from the case at bar; first, due to a much greater statistical deviation between the total population of the identifiable group and its membership in the jury venire, and secondly, because in cases relied on by the defendant, the jury selection system was one of personal preference or subjective selection on the part of the commissioners, and therefore subject to much greater abuse.

The case of *Castaneda v. Partida, supra*, concerns systematic exclusion of Mexican Americans in Hidalgo County, Texas. Hidalgo County contained a Mexican American population totaling 79.1%, yet the percentage of Mexican American grand jurors was only 39%, creating a 40% disparity between actual population and jury service. In selecting its juries the Hidalgo County jury commission utilized what was known as "the key man" system. This selection process allowed the jury commissioners to select individuals whom they personally felt were moral and forthright, and would make good jurors. As Mr. Justice Marshall pointed out in his concurring opinion, the selection system was entirely discretionary with Spanish surnamed persons being easily identifiable and thus excludable. By showing such a large numerical disparity of 40% and a totally subjective selection procedure, the defendant made out a prima facie case for selective exclusion requiring the State to rebut the showing.

The two other cases principally relied on by the defendant in advancing his Fourteenth Amendment claim are *Whitus v. Georgia, supra,* and *Turner v. Fouche,* 396 U.S. 346, 24 L.Ed. 2d 567, 90 S.Ct. 532 (1970). *Turner* was a class action brought by a Negro school child and her father. The case arose in Taliaferro County, Georgia which has a population composed 60% of Negroes. The statistics from Taliaferro County showed that while Negroes composed 60% of the general population, they composed only 37% of the list from which the grand jury was drawn. This created a disparity in the jury pool of 23%. Coupled with this high percentage of disparity was the totally subjective method in which jurors were selected. Potential jurors were placed into the jury pool "whenever a jury commissioner thought a voter . . . qualified as a potentially good juror." 396 U.S. at 350, 24 L.Ed. 2d at 573, 90 S.Ct. at 535. No name was selected for the jury pool unless personally known to one of the jury commissioners as "upright or intelligent." In *Turner* the United States Supreme Court noted a background of racial discrimination, and based upon this background, statistical evidence of a 23% disparity between total population and percentage in the jury pool, and a selection system grossly susceptible to abuse, the court found that the defendant had made a prima facie showing of systematic exclusion. In the case at bar the defendant presents no evidence comparable to that presented to the United States Supreme Court in *Turner.*

In *Whitus v. Georgia, supra,* the same jury selection procedure was employed with selection being based on the jury commissioner's subjective determination that the potential juror was "upright and intelligent." Georgia law prescribed that the names of prospective jurors were to be chosen from the books of the county's tax receiver. Prior to 1965 the tax returns for whites were kept on white paper while the tax returns for Negroes were recorded on yellow paper. The statistics presented by the defendant showed that 27.1% of the taxpayers were Negroes while only 9.1% of the grand jury members were Negroes and 7.8% of the petit jury venire were Negroes. This created an 18% and 19.3% disparity in the jury pool. Again, as in *Turner,* there is a jury selection process which is grossly subjective and statistics which support a conclusion that the system was being abused by systematic exclusion of an identifiable group.

In the cases relied on by defendant disparity between the identifiable group's total population and the percentage of that group in the jury pool varied from a low of 18% to a high of 40%. In Mecklenburg County defendant's figures showed the disparity at 9%. The systems used for jury selection in Texas (*Castaneda*) and in Georgia (*Whitus* and *Turner*) are also much more susceptible to abuse than the statutory scheme complied with by the Mecklenburg County jury commission. The legislative intent of G.S. 9-2 is to provide a system for objective selection of veniremen, and the defendant presented no evidence that this objective statutory scheme was subjectively applied in violation of the Fourteenth Amendment. The key to establishing a prima facie case of systematic exclusion is a statistical showing of under-representation plus a system of selection which allows the jury commission to exclude prospective jurors on account of race. The defendant's evidence in this case has shown neither.

*Swain v. Alabama, supra,* is very pertinent to the case at bar. In 1964 Alabama law required that all male citizens over the age of 21 be placed on the jury roll. In Talladega County, Alabama, 26% of the male population over 21 years of age was Negro, and yet Negroes made up only 10-15% of the grand and petit juries. As in the earlier discussed cases the jury commission utilized a very subjective test for determining a prospective juror. The commission was to select only intelligent men esteemed for good character and sound judgment. Here however the United States Supreme Court found that purposeful discrimination based on race alone was not satisfactorily proved by showing an identifiable group in the community was underrepresented by *10%*. The Court in discussing the jury selection procedure noted that ". . . an imperfect system [of selection] is not equivalent to purposeful discrimination based on race." 380 U.S. at 209, 13 L.Ed. 2d at 766, 85 S.Ct. at 830. Such is the case in Mecklenburg County. While the selection process may not provide a full pro rata representation of whites and blacks, the defendant's evidence does not show that the jury commission purposefully and systematically excluded blacks from the jury pool.

We now turn to defendant's contention that the selection of the Mecklenburg County jury venire violated his right to be tried by a jury drawn from a representative cross-section of the community as guaranteed by the Sixth Amendment and applied to

the States through the Fourteenth. In *Taylor v. Louisiana*, 419 U.S. 522, 528, 42 L.Ed. 2d 690, 697, 95 S.Ct. 692, 697 (1975) the United States Supreme Court held that the selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *Taylor* was concerned with the systematic exclusion of women from the jury pool where 53% of the persons eligible for jury service were female, but the actual jury pool was only 10% female. The court found this 43% disparity denied the defendant a jury drawn from a representative cross-section of the community. *Duren v. Missouri, supra*, was also concerned with systematic exclusion of women from the jury pool denying the defendant his Sixth Amendment right to a fair cross-section of the community. Here the population was composed 54% of women and yet the jury venire was only 15% female. In *Duren* the court held that to establish a prima facie violation of the fair cross-section requirement the defendant must show: (1) that the group alleged to be excluded is a distinctive group; (2) that the representation of the group within the venire is not fair and reasonable with respect to the number of such persons in the community; (3) that the under-representation is due to systematic exclusion in the jury selection process.

In applying the *Duren* test to the case *sub judice*, the defendant satisfies the first requirement for Negroes are an identifiable class. *See Strauder v. West Virginia, supra.* We do not think the defendant has established a prima facie case with respect to requirements two and three of the *Duren* test. In both *Taylor* and *Duren* the disparity between the female population in the community and the women in the jury pool exceeded 35%. Here the disparity totaled only 9%. In *Taylor* the court noted that the fair cross-section requirement must have much leeway in its application, and in *Duren* the court noted a *gross* discrepancy between the percentage of women in the jury venire and the percentage of women in the community. It does not appear that the defendant here has presented evidence showing any type of discrepancy comparable to the cases on which he relies. Even if we were to accept his statistical figures as showing an unfair cross-section, we fail to see evidence of systematic exclusion on the part of the Mecklenburg County jury commission.

We therefore hold that the defendant did not present sufficient evidence to establish a prima facie case of systematic exclusion based on race in violation of the Equal Protection Clause of the Fourteenth Amendment. We also hold that the defendant was tried by a jury composed of a fair cross-section of the community in compliance with the Sixth Amendment as applied to the States through the Fourteenth.

[2] Defendant next contends that the trial court erred in excusing jurors Curbeam and Averette for cause based on their responses to the court's questions concerning the death penalty. In its initial comments to these prospective jurors the court provided each with a cursory explanation of the trial procedures. After preliminary voir dire the court asked Mrs. Curbeam the following:

> "COURT: . . . Now, do you have any religious or personal convictions about the death penalty?
>
> Mrs. CURBEAM: I'm really not sure about my feelings about the death penalty.
>
> COURT: Let me ask you this. Do you have such convictions about the death penalty that even though the State satisfied you beyond a reasonable doubt that the defendant was guilty of first degree murder, you would not follow the law as explained to you by the court and consider imposing the death penalty, no matter what circumstances might appear from the evidence, that you would just not even consider it?
>
> Mrs. CURBEAM: I really, really don't know. Must I say yes or no right now?
>
> COURT: Yes ma'am, I'm afraid I have to have an answer as to your feelings on this. I'm not asking you would you do it, but would you listen to the law and consider the evidence and consider whether the death penalty should or should not be imposed? You wouldn't automatically say, 'Under no circumstances would I consider the death penalty'? That's what I'm asking you.

Mrs. CURBEAM: I don't believe I would. I don't believe I would consider the death penalty.

COURT: You do not?

Mrs. CURBEAM: I do not think I would."

Questioning of juror Averette proceeded as follows:

"COURT: What I'm asking you is, despite your feeling about the death penalty as a practice could you follow the law, and if you did make all the findings and were convinced of it, impose the death penalty?

Mr. AVERETTE: I'm not sure that I could. No, sir.

COURT: Well, would you say that your feeling about the death penalty is that in no event, no matter what the circumstances of the offense were, and no matter how strongly you felt the aggravating circumstances might overcome the mitigating circumstances, you still wouldn't impose the death penalty?

Mr. AVERETTE: I don't think so."

Following these questions the State moved to have these jurors removed for cause and the motion was allowed. Jurors Curbeam and Averette under questioning by the court responded that under no circumstances and regardless of the evidence they still would not impose the death penalty. Exclusion of prospective jurors when they express unequivocal opposition to imposition of the death penalty is proper. *State v. Atkinson*, 275 N.C. 288, 167 S.E. 2d 241 (1969); *State v. Washington*, 283 N.C. 175, 195 S.E. 2d 534 (1973); *State v. Doss*, 279 N.C. 413, 183 S.E. 2d 671 (1971); *State v. Honeycutt*, 285 N.C. 174, 203 S.E. 2d 844 (1974).

Defendant contends that the responses of jurors Curbeam and Averette to questions concerning imposition of the death penalty were equivocal and thus under the standards laid down in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770, *rehearing denied*, 393 U.S. 898 (1968) their exclusion was improper. We do not agree.

In *Witherspoon* the United States Supreme Court held that veniremen may not be excluded from a jury based on general objections to the death penalty or based on expressed conscientious or religious scruples against infliction of the death penalty. *See also State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975), *second appeal*, 291 N.C. 37, 229 S.E. 2d 163 (1976).

It is clear that jurors Averette and Curbeam expressed more than general objections to the imposition of the death penalty. Each affirmatively stated that he could not impose the death penalty regardless of the evidence presented. On this record the fact that their negative responses were phrased "I don't believe I would" and "I don't think so" does not equivocate their refusal to follow the law as given by the judge to such an extent as to make their challenge for cause improper. *See State v. Noell*, 284 N.C. 670, 685-86, 202 S.E. 2d 750, 760-61 (1974).

[3] In his third argument to this Court defendant contends that the trial court denied him his rights guaranteed under the Sixth and Fourteenth Amendments by granting the prosecution's challenges for cause of jurors who indicated an inability to comply with the judge's instructions as to the law and impose the death penalty if the evidence so required. Since we have previously determined that the jurors were properly excluded based on the criteria established by the United States Supreme Court in *Witherspoon, supra,* we must now determine if the jury as selected improperly excluded an identifiable group within the community. Such an exclusion would deprive the defendant of a jury composed of a fair cross-section of the community in violation of the Sixth Amendment as applied to the States through the Fourteenth Amendment.

The defendant contends that those with scruples against the death penalty are "a distinct, opinion shaped group" and their exclusion produces a prosecution prone jury skewed against Negroes and the lower economic classes. This argument was rejected by the United States Supreme Court in *Witherspoon* where that court held "we simply cannot conclude either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." 391 U.S. at 517, 518, 20 L.Ed. 2d

at 782, 88 S.Ct. at 1774, 1775. *See also Bumper v. North Carolina*, 391 U.S. 543, 20 L.Ed. 2d 797, 88 S.Ct. 1788 (1968).

In a number of recent decisions this Court has also expressly rejected the defendant's contention that a jury qualified pursuant to *Witherspoon* is non-representative and prosecution prone. *State v. Williams*, 275 N.C. 77, 165 S.E. 2d 481 (1969); *State v. Montgomery*, 291 N.C. 235, 229 S.E. 2d 904 (1976); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979); *State v. Honeycutt, supra*; *State v. Spaulding*, 298 N.C. 149, 257 S.E. 2d 391 (1979); *State v. Taylor*, 298 N.C. 405, 259 S.E. 2d 502 (1979).

In *Lockett v. Ohio*, 438 U.S. 586, 57 L.Ed. 2d 973, 98 S.Ct. 2954 (1978) four jurors were excluded from the jury panel based on their opposition to capital punishment. The defendant claimed this exclusion violated his Sixth Amendment right as guaranteed by *Taylor v. Louisiana, supra*. Eight Justices concurred in holding: "Nothing in *Taylor*, however, suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge." 438 U.S. at 596, 597, 57 L.Ed. 2d at 984, 98 S.Ct. at 2961.

No evidence has been presented in this case which convinces us that the prior decisions of this Court are incorrect. We therefore adhere to these decisions.

[4] The defendant's final contention is that there was insufficient evidence for the trial court to charge the jury on flight as a reason for the defendant's return to New York three days after the slaying of Robert Langston Moses. In *State v. Irick*, 291 N.C. 480, 494, 231 S.E. 2d 833, 842 (1977), this Court held that ". . . [s]o long as there is *some evidence* in the record reasonably supporting the theory that defendant fled after commission of the crime charged, the instruction is properly given. The fact that there may be other reasonable explanations for the defendant's conduct does not render the instruction improper." (Emphasis ours.) *See also State v. Lampkins*, 283 N.C. 520, 196 S.E. 2d 697 (1973).

The testimony of Andre Sharpe and John Lee Stewart provide sufficient evidence to support a charge on flight. Stewart testified that the defendant told him he had killed the cab driver and shortly after that Stewart discovered that the defendant had

left with Andre Sharpe for New York. Sharpe testified he was with the defendant on the night of September 4 when the deceased was murdered and that the defendant admitted to him that he had killed the deceased. Sharpe also heard the defendant tell John Lee Stewart that he had committed the murder. Sharpe then testified that later in the week around September 7 he went to New York with the defendant.

It is true that the defendant was originally from New York and the inference could be drawn that he was returning home. Simply because such an inference can be drawn does not make the instruction as to flight erroneous. *State v. Irick, supra.* There was competent evidence to support the charge of flight, and based on such evidence the trial court correctly instructed the jury.

From the evidence before the court this defendant committed a planned, deliberate and vicious killing of an innocent human being merely for the purpose of robbery to satisfy his personal desire for a little money. He is fortunate that the jury was unable to agree on the death penalty.

After careful examination of the entire record, and each of the defendant's assignments of error, we hold the defendant received a fair trial free from prejudicial error. Therefore the trial, verdict and judgment will be upheld.

No error.

Justice EXUM dissenting.

General Statute 15A-2000 contemplates a bifurcated trial procedure wherein the jury's determination of a defendant's guilt or innocence in a capital case is separate and independent from its later imposition of punishment should guilt be found. Under these circumstances, to permit the state to challenge an unlimited number of veniremen at the guilt phase of the trial for no "cause" other than that they would refuse to consider capital punishment at the sentencing phase works a systematic exclusion from jury service of that class of persons whose opposition to the death penalty precludes their vote for its imposition. Such an exclusion attains constitutional significance when it is shown that the members of the class excluded tend to share a commonality of in-

terests and attitudes not represented on the remaining jury panel. I believe that defendant's evidence in this case has sufficiently demonstrated that persons who strongly oppose the death penalty constitute a group "cognizable" for purposes of jury selection analysis. The state has failed to provide adequate justification for the purposeful exclusion of this group on the guilt phase of the trial. The result is that defendant has been deprived, on the guilt phase of the case, of a venire composed of a fair and representative cross section of the community in violation of his constitutional jury trial rights guaranteed by the Sixth Amendment to the United States Constitution and by Article I, Section 24, of the North Carolina Constitution. Consequently, I respectfully dissent from that portion of the majority opinion which holds to the contrary and vote for a new trial.

"It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *Smith v. Texas*, 311 U.S. 128, 130 (1940). Community representation is required because the very purpose of the jury system is to temper the application of the law with the "commonsense judgment of the community." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). Thus, in a criminal case, "the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Williams v. Florida*, 399 U.S. 78, 100 (1970). It is for this reason that the Sixth Amendment right to a jury trial[1] guarantees the selection of a petit jury from "a representative cross section of the community." *Taylor v. Louisiana, supra* at 528. No less, I believe, can be said of the jury trial guarantee in Article I, Section 24, of the North Carolina Constitution.

There is, of course, no constitutional requirement that a petit jury actually chosen from a representative venire provide a perfect mirror of the community's diversity. The right to a jury trial is not a right to have every jury contain representatives of all the economic, social, religious, racial, political, and geographic

1. The Sixth Amendment is applicable to the states through the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145 (1968).

groups of the community. But it *is* a right to have prospective jurors selected "without systematic and intentional exclusion of any of these groups." *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220 (1946). The Sixth Amendment comprehends at the least a set of jury selection procedures which will ensure "*a fair possibility* for obtaining a representative cross section of the community." *Williams v. Florida, supra* at 100. (Emphasis supplied.) This possibility is destroyed by any process which leads to the systematic exclusion of "identifiable segments playing major roles in the community." *Taylor v. Louisiana, supra* at 530; *see also Peters v. Kiff*, 407 U.S. 493, 500 (1972); *State v. Robertson*, 284 N.C. 549, 552, 202 S.E. 2d 157, 160 (1974).

*Duren v. Missouri*, --- U.S. ---, 58 L.Ed. 2d 579 (1979), held, as the majority notes, that in order for a defendant to make out a fair cross section violation under the Sixth Amendment he must show, *id.* at ---, 58 L.Ed. 2d at 587:

> "(1) That the group allowed to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process."

Systematic exclusion means "inherent in the particular jury-selection process utilized." *Id.* at ---, 58 L.Ed. 2d at 588. Unlike equal protection challenges to jury selection based on discrimination, which require a showing of a discriminatory purpose, a Sixth Amendment fair cross section challenge requires only the showing of a systematic disproportion of the distinctive group alleged to have been excluded. No discriminatory purpose is required. "[I]n Sixth Amendment fair-cross-section cases, systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross-section. The only remaining question is whether there is adequate justification for this infringement." Id. at ---, n. 26, 58 L.Ed. 2d at 589, n. 26.

The challenges for cause allowed in this case effected a systematic exclusion from the venire[2] of all persons whose strength of opposition to the death penalty was such that under no circumstances could they vote to impose capital punishment. The relevant inquiry is whether such persons comprise as a class an "identifiable segment" of the community, the exclusion of which denies defendant a jury selected from a representative venire.

For the purpose of jury selection analysis, the cognizability of any group depends largely upon (1) whether the group members share a common perspective or outlook on human events, and (2) if so, whether the exclusion of the group from jury service will tend to result in jury deliberations significantly deprived of the group's perspective.[3] Since "the counterbalancing of various biases is critical to the accurate application of the common sense of the community to the facts of any given case,"

---

2. *Duren v. Missouri, supra,* and the earlier fair cross section case of *Taylor v. Louisiana, supra,* 419 U.S. 522, were concerned only with the selection of the venire itself. The Court had only to point to the large discrepancies in those cases between the number of women which appeared in the venires and the number in the community at large to find the element of unreasonable under-representation. There was no need for further analysis in either case. Where, however, as here, the venire contains at the outset a presumably representative number of persons who could not vote to impose the death sentence and the state is allowed to exercise unlimited challenges for cause to reduce that number to zero, the effect is the same as if those persons had been denied access to the venire in the first place. It is the effective mode of exclusion, not the time of its application, which is constitutionally significant. "All that the Constitution forbids . . . is systematic exclusion of identifiable segments of the community from jury panels *and from the juries ultimately drawn from those panels.* . . ." *Apodaca v. Oregon,* 406 U.S. 404, 413 (1972). (Emphasis supplied.)

3. For instance, in *United States v. Guzman,* 337 F. Supp. 140 (S.D.N.Y. 1972), *aff'd* 468 F. 2d 1245 (2d Cir. 1972), *cert. denied,* 410 U.S. 937 (1973), the trial court defined a "cognizable" group as one which (1) has a definite composition according to some definitive quality or attribute, (2) maintains a cohesive set of "attitudes or ideas or experience," and (3) represents a "community of interest" which may not be represented by other segments of society. 337 F. Supp. at 143-44. Cases from other jurisdictions have similarly examined group cognizability in terms of attitudinal significance. *See, e.g., United States v. Butera,* 420 F. 2d 564 (1st Cir. 1970) (The "less educated" comprise "a sufficiently large group with sufficiently distinct views and attitudes that its diluted presence on the jury pool requires some explanation by the government."); *Rubio v. Superior Court of San Joaquin County,* 154 Cal. Rptr. 734, 593 P. 2d 595 (1979) (Members of a cognizable group share "a common social or psychological outlook on human events" not otherwise represented on a jury from which they are excluded.); *Mooney v. State,* 243 Ga. 373, 254 S.E. 2d 337 (1979) (Persons 18-21 years of age do not constitute a

*Ballew v. Georgia*, 435 U.S. 223, 234 (1978), it is the *effect* of group exclusion which may work an injury of constitutional dimension:

> "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that their exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." *Peters v. Kiff, supra,* 407 U.S. at 503-04.

By similar reasoning, this Court has recognized that even the complete exclusion of a group or class from the jury venire may be permissible under the Sixth Amendment and Article I, Section 24, of the North Carolina Constitution "*so long as* there is no reasonable basis for the conclusion that the ineligible group or class would bring to the deliberations of the jury a point of view not otherwise represented upon it." *State v. Knight,* 269 N.C. 100, 104, 152 S.E. 2d 179, 182 (1967). (Emphasis supplied.)

The uncontradicted evidence presented by the defendant in this case demonstrates that persons opposed to capital punishment have for many years constituted a substantial percentage of our population.[4] Moreover, the narrower class of those whose opposition to the death penalty would prevent their consideration as

cognizable group absent a showing that their "attitudinal segment" is unique or significant.). *Compare State v. Jenison,* 405 A. 2d 3 (R.I. 1979) (College presidents, professors, students, and tutors are recognized as a cognizable group without more; the Court need not "speculate on the particular qualities shared by this group that are missing from the spectrum of views on a jury that excludes its members.").

4. Dr. Hans Zeisel, Professor Emeritus of Law and Sociology at the University of Chicago School of Law, testified to various Gallup polls and other surveys which show that public support in the United States for the death penalty has fluctuated markedly. In 1960 it was 52%; 1965, 45%; 1966, 42%; the average percentage of people now favoring the death penalty is 70%. Professor Zeisel, a lawyer and sociologist, is a renowned and respected scholar in the area of the interaction of the discipline of law and sociology. His and Kalven's definitive work, *The American Jury* (1966), has been regularly cited by the United States Supreme Court and was heavily relied on in *Ballew v. Georgia,* 435 U.S. 223 (1978).

jurors of its imposition has also comprised a substantial minority of the population.[5] The evidence further shows that these persons generally exhibit attitudinal characteristics markedly different from those shared by people who favor the death penalty as an instrument of the criminal law. All of the available data suggest that persons who are strongly opposed to capital punishment tend also to be less authoritarian,[6] more liberal in their political attitudes,[7] less punitive in their legal attitudes,[8] and less likely to endorse "discrimination against minority groups, restrictions on civil liberties, and violence for achieving social goals"[9] than persons who favor the death penalty. The attitudinal differences become even more distinct with regard to those whose scruples would prevent their vote for capital punishment regardless of the evidence in the case.[10] The data are remarkably consistent, furthermore, in showing that attitudes about capital punishment cut unequally across various demographic lines. Opposition to the death penalty, for example, is more pronounced among women than men, non-whites than whites, high school and college graduates than non-graduates, and lower income groups than higher.[11]

5. A 1971 Harris Poll indicated that of the 36% of the population then opposed to the death penalty, slightly less than two-thirds (or 23% of the population) would be willing to state that as a member of the jury they would refuse to vote for the death penalty under any circumstances. The poll is reported and analyzed in White, "The Constitutional Invalidity of Convictions Imposed by Death-Qualified Jurors," 58 Cornell L. Rev. 1176 (1973).

6. Boehm, "Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques to the Problem of Jury Bias," 1968 Wisc. L. Rev. 734.

7. R. Crosson, "An Investigation into Certain Personality Variables Among Capital Trial Jurors," unpublished doctoral dissertation, Case Western Reserve University, 1966.

8. Jurow, "New Data on the Effect of a 'Death Qualified' Jury on the Guilt Determination Process." 84 Harv. L. Rev. 567 (1971). *See also* White, *supra* note 5; Zeisel, "Some Data on Juror Attitudes Toward Capital Punishment," University of Chicago Center for Studies in Criminal Justice, 1968.

9. Bedau and Pierce, Capital Punishment in the United States 134-35 (1976).

10. *See* White, *supra* note 5, at 1186 n. 54.

11. *See generally* Vidmar and Ellsworth, "Public Opinion and the Death Penalty," 26 Stan. L. Rev. 1245 (1974); Bronson, "On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen," 42 U. Colo. L. Rev. 1 (1970); White, *supra* note 5. The relevant studies are summarized in Girsh, "The Witherspoon Question: The Social Science and the Evidence," 35 NLADA Briefcase 99 (September 1978).

State v. Avery

Viewed in connection with the facts of this case, the evidence is compelling, moreover, that the exclusion of veniremen unalterably opposed to the imposition of capital punishment results in the systematic under-representation of black jurors. The results of a 1971 Harris Poll indicate that such an exclusion would deny jury service to thirty-five percent of blacks but only twenty-one percent of whites.[12] Uncontradicted evidence in the record before us shows that a far greater percentage of blacks harbor intense opposition to the death penalty than do whites.[13] This evidence is borne out by the results of the *voir dire* challenges in the instant case. Of the 57 persons in the jury venire who were examined for possible service on the petit jury which tried defendant, 15 (26%) were black. Of these 15, 9 were permitted to be challenged for cause on the ground that they would under no circumstances vote to impose the death penalty. Two white veniremen were challenged for cause on the same ground. The state's challenges for cause thus resulted in the exclusion of 60% of the black citizens examined on the venire and approximately 5% of the white citizens so examined.

I believe that the cumulative weight of the evidence just discussed supports the conclusion that the group of citizens automatically excluded from the venire in this case by the state's challenges for cause constitutes (1) an identifiable segment of the community with (2) distinctive characteristics of attitude and outlook which in any fair system of criminal justice ought to be allowed a chance for representation in the jury's deliberations. At the very least, the evidence proffered by defendant conclusively demonstrates that the challenges for cause here allowed systematically exclude a disproportionate number of blacks. There can be no doubt that black citizens define a cognizable group for jury selection purposes. *See, e.g., Whitcomb v. Chavis,* 403 U.S. 124 (1971), wherein the Supreme Court found no occasion to emphasize the question of cognizability, despite belabored findings by the district court on the issue.

12. *See* White, *supra* note 5, at 1194.

13. Professor Zeisel testified that opposition among black citizens to the death penalty has remained consistent at around 70%. *See also* Bronson, *supra* note 11, at 20; Vidmar and Ellsworth, *supra* note 11, at 1254 n. 38.

A cursory reading of *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and its companion decision, *Bumper v. North Carolina*, 391 U.S. 543 (1968), might suggest that these cases foreclose the conclusions I reach here. I do not so read these cases. In both *Witherspoon* and *Bumper* the state procedure under consideration involved capital cases in which the same jury decided the issues of guilt and punishment in a single proceeding.[14] In each case the Supreme Court denied a contention that a guilty verdict could not be constitutionally returned by a petit jury selected from a venire from which all persons who had "scruples" against the death penalty were challenged for cause. In *Witherspoon* the Court did overturn on due process grounds a sentence of death rendered by such a jury. In *Bumper* the Court overturned the verdict of guilty because unconstitutionally seized evidence had been introduced. While the argument that the jury chosen from the venire was rendered unrepresentative by improperly allowed challenges for cause might have been suggested in these cases, the principal contention in *Bumper* and *Witherspoon* was to the effect that the challenges for cause resulted in petit juries which were "conviction prone" or "biased in favor of conviction" and that defendants were thereby denied due process of law. The Supreme Court concluded that the data presented were simply too "tentative and fragmentary" to conclude *either* "that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Witherspoon v. Illinois, supra*, 391 U.S. at 517, 518. The clear implication of this language is that a stronger evidentiary showing in the future might establish that a jury from which those unalterably opposed to the imposition of capital punishment are excluded is a jury less than representative on the issue of guilt or biased in favor of the prosecution.

In sustaining Witherspoon's due process argument on the question of punishment, the Court noted, 391 U.S. at 520:

---

14. The Illinois procedure applicable in *Witherspoon* permitted the jury to return in its discretion a verdict of death along with the determination of guilt. Ill. Rev. Stat., c. 38, § 1-7(c)(1) (1967). The crime of rape charged in *Bumper* was punishable by death unless the jury returned a specific recommendation of life imprisonment "at the time of rendering its verdict in open court." N.C.G.S. § 14-21 (1953).

"If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty."

It then added, at n. 18:

"Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt*. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution."

Defendant argues strenuously that he has met the challenge laid down in *Witherspoon* to demonstrate that a petit jury selected as this one was in accordance with the *Witherspoon* standard is, indeed, biased in favor of guilt. The studies and data presented in this case do consistently and forcefully suggest that a jury culled of those who would not vote for the death penalty is in fact a jury prone to convict on the guilt phase.[15] Moreover, despite intimations in the majority opinion to the contrary, the evidence adduced in this case on the "guilt prone" tendencies of a *Witherspoon*-qualified jury is substantially greater than that which was available to the Supreme Court in *Witherspoon* or *Bumper*, or to this Court in our own prior decisions.[16] Defendant's argument and the new data upon which it rests warrants careful review and I commend it for consideration by our General Assembly. I do not choose to reach its merits, however, because I believe that defendant has made a sufficient showing, not made in

15. *See generally* the sources cited in notes 5-9, and note 11 *supra*.

16. In addition to pre-*Witherspoon* studies, defendant in this case submitted for the trial court's consideration studies by Zeisel, *supra* note 8; Boehm, *supra* note 6; Bronson, *supra* note 11; Jurow, *supra* note 8; and White, *supra* note 5. There is no indication in any of our previous cases that any of these sources were presented or considered.

*Witherspoon* or *Bumper*, that the jury in this case was, on the guilt phase of the trial, substantially unrepresentative of the community's conscience.

This, however, is not the end of the inquiry. Even systematic exclusion of identifiable groups may be constitutionally permissible if "a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Duren v. Missouri, supra,* --- U.S. at ---, 58 L.Ed. 2d at 589. The right to a representative jury cannot be overcome merely because the state can show some reason for the exclusions which render the jury venire non-representative. *Taylor v. Louisiana, supra,* 419 U.S. at 534; *Duren v. Missouri, supra,* --- U.S. at ---, 58 L.Ed. 2d at 589. The burden is upon the state to show that the "attainment of a fair cross-section [is] incompatible with a significant state interest." *Duren v. Missouri, supra,* --- U.S. at ---, 58 L.Ed. 2d at 589-90.

The state no less than the defendant has a significant interest in obtaining a jury composed of persons who can sufficiently put aside personal biases to follow and apply the applicable law. Such an interest is normally advanced by excluding "for cause" those jurors who cannot. Indeed, the very purpose of allowing unlimited challenges for cause is to enable the parties to obtain a fair and impartial jury. *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833 (1969); *State v. English,* 164 N.C. 498, 80 S.E. 72 (1913). General Statute 15A-1212(8) permits the excusal for cause of any potential juror who, "[a]s a matter of conscience, regardless of the facts and circumstances, *would be unable to render a verdict* with respect to the charge in accordance with the law. . . ." (Emphasis supplied.) General Statute 15A-1212(9) further provides for a challenge to any potential juror who "[f]or any other cause *is unable to render a fair and impartial verdict.*" (Emphasis supplied.) It is thus the venireman's demonstrated inability to maintain impartiality and to follow the law which properly triggers a party's right to challenge for cause. "[I]t is the fixedness of the [biased] opinion . . . which constitutes the exception"; the mere expression of an opinion which might favor one side or the other does not constitute grounds for a challenge for cause absent further inquiry into the "*fact* of favour or indifference." *State v. Benton,* 19 N.C. (2 Dev. & Bat.) 196, 213 (1836). (Emphasis original.)

Where the *voir dire* inquiry elicits from a potential juror the fact that his biases are such as to preclude his rendering an impartial verdict, he is properly excused from the venire. A venire from which such jurors have been removed by challenges for cause is constitutionally permissible even if it is no longer representative of the community.

In *Lockett v. Ohio*, 438 U.S. 586 (1978), the state was rightly permitted to challenge all jurors who stated that they were so opposed to capital punishment that "they could not sit, listen to the evidence, listen to the law, [and] make their determination solely upon the evidence and the law without considering the fact that capital punishment might be imposed." *Id.* at 595. The Supreme Court held that the right to a representative jury did not include the right "to be tried by jurors *who have explicitly indicated an inability to follow the law* and instructions of the trial judge." *Id.* at 596-97. (Emphasis supplied.)

*Lockett* did not involve the kind of challenge for cause permitted here. No challenged juror in the present case stated that because of opposition to the death penalty he or she could not under any circumstances return a guilty verdict. All simply stated that they could not vote for the imposition of the death penalty. These jurors, therefore, did not demonstrate any bias on any of the critical issues in the guilt phase of the trial. Their bias related only to the sentencing phase. The state has not demonstrated that the jurors challenged for cause because of opposition to the death penalty could not have followed the law and been impartial on the guilt phase of the case. Unless, therefore, the state has a significant interest in having precisely the same jurors who determine guilt also determine punishment, a fair cross section violation has been shown because of the systematic exclusion of those unalterably opposed to imposition of the death penalty.

Given the alternatives already provided by G.S. 15A-2000, I do not believe such a significant interest exists. This statute provides for a bifurcated trial in capital cases.[17] The first phase is for the purpose of determining guilt; the second, punishment. While

---

17. This procedure was not, as I have already shown, in use in either Illinois or North Carolina when *Witherspoon* and *Bumper* were considered by the United States Supreme Court. *See* text at note 14 *supra*.

the statute seems to contemplate that the same jury which determines guilt should ordinarily also determine punishment, it does provide that if before the punishment phase "any juror dies, becomes incapacitated *or disqualified, or is discharged for any reason,* an alternate juror shall become a part of the jury and serve in all respects as those selected on the regular trial panel." G.S. 15A-2000(a)(2). (Emphasis supplied.) Furthermore the statute provides that if the jury which determines guilt is unable "to reconvene" for the punishment phase, "the trial judge shall impanel a new jury to determine the issue of punishment." *Id.*

Thus the bifurcated trial procedure provides two reasonable alternatives to having precisely the same jurors pass on both guilt and punishment. If the petit jury contains some members who, qualified on the guilt phase, were because of the strength of their opposition to capital punishment disqualified on the sentencing phase, alternate jurors qualified on the sentencing phase could be empaneled at the outset to hear both phases. These alternate jurors would not, however, participate in deliberations on guilt. If a guilty verdict were returned, these alternates would replace, on the sentencing phase of the case, their counterparts disqualified on this phase. Another alternative provided by the statute is to empanel a different jury for the punishment phase if the jury on the guilt phase was "unable to reconvene" because all of its members were disqualified on the question of punishment. In this latter circumstance nothing would prevent the second, punishment jury from hearing the guilt phase of the trial simultaneously with the guilt phase jury. This would avoid the necessity of reintroducing evidence on the punishment phase.

If North Carolina is to maintain the death penalty as an instrument of the criminal law, this Court should insist that in cases in which this penalty may be exacted a defendant's constitutional rights be scrupulously protected. None of these rights should be withered to insure a more expeditious proceeding. The fundamental right to a fairly representative jury is essential to the integrity of the fact finding process. The procedures I have suggested would better serve to guarantee that right. The extra burdens on the state attendant to these procedures seem a small price to pay in the context of proceedings aimed at determining whether the law's ultimate penalty, death, shall be imposed.